UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 08-45257** |
| PETTERS COMPANY, INC., ET AL, | Court File No. 08-45257 |
| Debtors. | Court File Nos: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc. | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DOUGLAS A. KELLEY, in his capacity as the court-appointed Chapter 11 Trustee of Debtor Petters Company, Inc., | |
| Plaintiff, | |
| v. | ADV 10-4422 |
| ASSOCIATED BANK, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER GRANTING DEFENDANT'S MOTION FOR DISMISSAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

At St. Paul, Minnesota
February 29, 2016.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *02/29/2016*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

This adversary proceeding came before the court for oral argument on three specific aspects of the Defendant's motion for dismissal. The Defendant ("Associated Bank") appeared by its attorney, Bryan E. Minier, Pedersen & Houpt, P.C., Chicago. The Plaintiff ("the Trustee") appeared by his attorneys, Terrence J. Fleming and James A. Lodoen, Lindquist & Vennum, P.L.L.P., Minneapolis. The following order addresses Associated Bank's motion in its entirety.

## INTRODUCTION

In 2010, a large docket of avoidance litigation was commenced in the Chapter 11 cases of Debtors Petters Company, Inc. ("PCI") and its related entities, to address the failure of the massive Ponzi scheme perpetrated by Thomas J. Petters through those companies. *See, e.g., In re Petters Company, Inc.*, 494 B.R. 413, 495 B.R. 887, and 499 B.R. 342 (all Bankr. D. Minn. 2013). This adversary proceeding was commenced during the first wave in that litigation.

However, in its pleaded factual basis this matter differs significantly from the bulk of the docket. In most of the adversary proceedings, the Trustee has sued parties that had lent to PCI, documented for the funding of commercial transactions that actually had been postured as a central part of the Ponzi scheme. As to those defendants, he seeks to recover all or a portion of PCI's payback on that lending. Those proceedings were sued on the general theory that the payments to the defendants enabled the fraud on contemporaneous or later investor-lenders into the scheme.[1] This, the Trustee asserts, eventually resulted in the vast (several-billion-dollar) shortfall at the scheme's collapse. *In re Petters Company, Inc.*, 495 B.R. at 908.

_____

[1]In an opinion out of litigation with the Petters scheme in its history, the Seventh Circuit described the rolling fraud of a Ponzi scheme's operation:

> The round-trip transactions that began in February 2008 extended the life of the Petters scam and turned the [Lancelot] Funds themselves into a Ponzi scheme. Such schemes can operate only as long as they pay existing investors' claims. Once they stop paying old investors, new investments stop coming in and the scams collapse. Thus ongoing payments are integral to the fraud.

*Peterson v. Somers Dublin, Ltd.*, 729 F.3d 741, 748 (7th Cir. 2013).

2

As the Trustee pleads this matter, however, Associated Bank was not a transaction-specific lender roped into the scheme.  The Trustee's amended complaint [Dkt. No. 8] names Associated Bank as a depository bank through which PCI channeled a large number of monetary transfers from and to lender-investors and others over a five-year period, 2000-2005.[2]  Through it, the Trustee sues to reverse the legal effect of six identified, discrete events that occurred during that banking relationship.

The vocabulary for the fact-pleading on these events is somewhat opaque.  This is particularly striking given the very specific structure of the banking relationship in which the transfers are alleged to have occurred.  The Trustee uses the term "payments or other transfers," made by PCI to the Bank, to describe these events.  He lists them in an exhibit to the amended complaint.  They are identified to separate dates between March 14, 2000 and October 3, 2002.  He does not identify the transactional form in which the "payments" were made.  It is clear, however, that the transfers were effected through PCI's business checking account with the Bank, or at least in relation to the account in some way.  Amended Complaint, ¶ 40.  The total of the "payments or other transfers" that would be avoided is stated as approximately $2.5 million.

The Trustee alleges that these "transfers" rectified prior "overdrafts" on the account--each one thus constituting "payment" on "a short-term open credit transaction."  He asserts that these "payments" were "in furtherance of" the Ponzi scheme because they kept the account standard-compliant and open, thereby enabling PCI to maintain a functional tool for monetary transfers that was essential to the scheme's operation.  On that theory the Trustee brands the

---

[2]According to what Associated Bank says, this is not accurate; a different bank handled the accounts in question during the years in question.  However, Associated Bank acknowledges that it is the successor-in-interest to that bank, by intervening merger or acquisition.  More to the point, it does not deny that it is a proper party-in-interest as defendant.  "The Bank" will signify the financial institution through which PCI actually did the banking in question during those years.  "Associated Bank" will signify the financial institution that is now defending this lawsuit.

"transfers" as fraudulent and hence avoidable under law, as actually- or constructively-fraudulent.[3]

The fact-pleading for the Trustee's theory of suit against Associated Bank is as

follows.[4]

35.     During the relevant time period, PCI maintained multiple bank accounts at Associated Bank (the "PCI Associated Bank Accounts"). [Tom] Petters and his Associates[5] utilized the PCI Associated Accounts to funnel investor funds through the Ponzi scheme.

36.     Pursuant to the fraudulent mechanisms [of the scheme, Tom] Petters and his Associates funneled funds from various investors through the PCI Associated Bank Accounts and back to the investors at excessive rates of return.   Daily transfers through the PCI Associated Bank Accounts ranging from $100,000 to $1,000,000 were   common,   and   transactions   ranging   from $1,000,000-$5,000,000 occurred occasionally.   From 2000 through 2005,   approximately   $780   million   was   transferred   in   and subsequently out of the PCI Associated Bank Accounts.

37.     On numerous occasions, [Tom] Petters and his Associates overdrew the PCI Associated Bank Accounts, thereby creating a debtor-creditor relationship between PCI and Associated Bank. . . . [T]he payments or other transfers total[ ] at least $2,539,337.37 that PCI made to pay off obligations owing pursuant to the Credit Transactions, or for the benefit of Associated Bank.[6]

_____

[3]Using the empowerment of 11 U.S.C. § 544(b), *see In re Petters Co., Inc.*, 494 B.R. at 421 n.6, the Trustee relies on the Minnesota enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41 - 513.51 (2014) ("MUFTA"), for his substantive legal authority.  (In 2015 the Minnesota legislature amended and retitled MUFTA using a new uniform law, the Uniform Voidable Transactions Act. 2015 Minn. Laws, ch. 17.  The amendment applies only to transactions that occur after August 1, 2015. 2015 Minn. Laws, ch. 17, ¶ 13.  Thus, MUFTA's provisions still apply to this adversary proceeding.)

[4]This is a verbatim quotation of this sequence from the amended complaint.  It continues to feature the Trustee's specific identification of Associated Bank as the participating transferee, though apparently that was not the case as a historical fact.

[5]Named earlier as Deanna Coleman, Robert White, Larry Reynolds, Michael Catain, and James Wehmhoff, five specific individual "conspirators" with Tom Petters who "assisted" him in the operation of the scheme.  Amended Complaint, ¶ 20, p. 5.

[6]As itemized on Exhibit A to the complaint, the six alleged transfers are as follows:

| | |
|---|---|
| 3/14/2000 | $1,312,936.80 |
| 9/26/2000 | $  450,874.64 |
| 12/21/2000 | $  665,664.63 |
| 1/11/2001 | $  106,025.48 |
| 10/3/2002 | $      3,807.82 |

38.     In each of these instances, Associated Bank would lend PCI the funds necessary to cover the amount of the overdraft by way of a short-term open credit transaction (collectively, the "Credit Transactions").[7]

39.     Shortly thereafter following each of the Credit Transactions, PCI would make a payment to Associated Bank that would serve to repay the loan of the overdraft amount lent to PCI by Associated Bank.

40.     Prior to the Petition Date, PCI made payments or other transfers totaling at least $2,539,337.37 to pay off obligations owing pursuant to the Credit Transactions, or for the benefit of Associated Bank (the "Negative Balance Transfers").

41.     On information and belief, the Negative Balance Transfers were made from funds derived from wholly fraudulent and fabricated financial transactions conducted in connection with the Ponzi scheme.

42.     Associated Bank knew or should have known that it was benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters and PCI in connection with the Ponzi scheme.

43.     The Negative Balance Transfers consisted of substantial amounts of investors' money that, instead of financing legitimate transactions, was used to pay back the Credit Transactions from Associated Bank.

Amended Complaint, pp. 8-10.

## MATTERS AT BAR

As its initial response to the Trustee's complaint, Associated Bank filed a motion for

dismissal.  It raised several contentions with the Trustee's pleading and his theory of suit.  Dozens

of other defendants on this docket did the same thing.  Some of Associated Bank's issues fell into

the mainstream of the broader defense effort.  They were addressed in the three "consolidated

issues" memoranda [Dkt. Nos. 1951, 2018, and 2044, formally cited *supra* at p. 2].

---

                10/3/2002                                    $         28.00

[7]The definition here apparently retrojects to ¶ 37.

5

Early in the litigation, some individual defendants came forward to assert that they had issues unique to them, potentially dispositive as matters of law, due to past transactional relationships with the Debtors that were different from the straight lending transactions common to most defendants.  While the massed motions for dismissal were being administered on a common opening track, such individual defendants were allowed to request rulings on their unique issues.

Associated Bank raised several such issues for itself.   Thus this adversary proceeding was excepted from the provision for further pleading and resumption of the litigation [BKY 08-45257, Dkt. No. 2158].  Supplementary briefing on Associated Bank's issues was directed. That was filed and oral argument was received.

Associated Bank's unique issues go to the pleading of the Trustee's fraudulent-transfer counts under both statutory variants (actually- and constructively-fraudulent).   The argument is that the Trustee has not pled a plausible set of facts to support either theory of avoidance as to the six banking events at issue with Associated Bank.

When the parties' arguments were structured and presented, counsel relied on the analysis of case law then extant--the three common-issues memoranda issued in the PCI cases, persuasive appellate precedent from other circuits on the application of fraudulent-transfer remedies to transactions documented as ordinary-course commercial arrangements, and the like. After this motion was submitted, the Minnesota Supreme Court issued *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015).   *Finn* treated the application of avoidance remedies under MUFTA to transfers of money made by the perpetrator of a later-failed Ponzi scheme, on financing given for genuine commercial transactions.   Though the transactions and transfers treated in *Finn* are different from the ones at bar, *Finn*'s analysis and rulings offer some principles for the treatment of this motion.

Some of Associated Bank's initial arguments seemed to challenge rulings previously made in the PCI common-issues memoranda.  *Finn*'s take on the subject matter was different

enough that both those arguments and this court's previous rulings required reexamination.  The strength of a couple of *Finn*'s component holdings moots most of the many tangents that Associated Bank argued.  In the end, *Finn* supports a particular outcome here--dismissal for the want of a plausibly-pled case, and no possibility of pleading one via amendment.  First, though, it is appropriate to indulge the parties in one of the many complications they raised in brief and argument--just to lay out the groundwork for the result.

### ANALYSIS

### 1. Trustee's Pleading of Lender-Borrower Relationship

For the six account-events at issue, the Trustee's pleading firmly stamps a specific transactional relationship onto the active parties--PCI as account-holder and Associated Bank as depository bank.  But then he abruptly classifies Associated Bank as a *lender* to PCI.  This is signified by his choice of vocabulary:  "loan" and "obligation" on a "short-term open end credit transaction."  As the Trustee envisioned these "loans," they were made in response to shortfalls in PCI's account that had occurred when "Petters and his Associates overdrew" the account. Amended Complaint, ¶ 37.[8]  The Trustee does not plead any factual detail for the associated event of "overdraft"--i.e. just when Associated Bank honored a check that had been presented for payment at a time when PCI's account did not contemporaneously hold sufficient funds to cover it.  All he says is that the Bank "would lend PCI the funds necessary to cover the amount of the overdraft  . . . ."  Amended Complaint, ¶¶ 37-40.

For its defense, Associated Bank fell into the Trustee's initial, unilateral impress of a consensual debtor-creditor relationship. In consequence, the parties argued over the adequacy of the Trustee's fact-pleading to support this characterization.  The dispute became lengthy and snarled, over whether Associated Bank had become a creditor of PCI--in legal consequence of the

---

[8]The Trustee expanded on this view of the transactions in his original supplemental memorandum [Dkt. No. 15], 3, 5; and his second supplemental memorandum [Dkt. No. 26], 3.

account-events in question, on some kind of contractually-contemplated extension of credit, or otherwise.

Associated Bank insisted that the Trustee had to, but did not, plead in detail the circumstances that initially gave rise to an insufficient-funds status for PCI's account, for each of the six sequences that involved a debt created on an overdraft and a transfer made when the consequences of the overdraft were rectified.  As Associated Bank would have it, this required pleading multiple factual aspects of each sequence:  the account balance before the presentation of every check that caused an NSF status and any that resulted in a separate overdraft; the detail on the checks and their treatment at the Bank's instance; and the account balances thereafter.  And, Associated Bank insisted, the Trustee never specified a factual or legal basis for the arising of a debt on the occurrence of an overdraft: a contractual program for overdraft protection under a commercial account-holder agreement?  The bare consequence of governing general law?  The Bank's simple act of honoring a check otherwise-to-bounce upon its initial presentment, with the account status held in the stasis of further NSF until money was received from PCI?  Or the intentional deferral of honoring, until the "midnight deadline" under Article 4 of the Uniform Commercial Code had passed?

The Trustee did not plead any of this.  For that matter, he did not even plead as to one obvious question: *how* was the rectifying transfer *made*, when the hypothesized debt was satisfied?  Was it just a later, regular-course deposit of funds into the account from a different source, that "made up" to a balance sufficient to rectify the NSF posture and enable the honoring of draws then-presented?  Or was it a special, directed forwarding of funds, outside the channel of the account's structure?  Or was it something else?

The Trustee pleaded barely more than a page of facts specific to this adversary proceeding, in the middle of several dozen pages of boilerplate for his clawback-avoidance theory.  In doing this he was too coy by half.  One suspects he was casting any debt cognizable here as the

8

result of a "loan" in order to make the amended complaint's vocabulary fit more into the general

theory of suit for his avoidance litigation.

In the way it first confronted the Trustee, Associated Bank is vulnerable to the same

charge. It was too cute by half in trying to shoehorn multiple factual assertions and more factual

*assumptions* into the record as if they were *pleaded* fact. Worse, Associated Bank did this without

having filed an answer and without using a platform of extrinsic documents argued as "necessarily

embraced by the pleadings" and presented for facial content that would go to material facts.[9]

Associated Bank also significantly distorts various components of the Trustee's legal argument,

mischaracterizing them as admissions or concessions on points favorable to it when they are

nothing of the sort.

But there is much to support Associated Bank's first vocabulary-driven point, that the

Trustee's amended complaint does not plausibly plead the specific status he alleges for the Bank--

"lender" based on a "credit extension."[10] The Trustee relies on a broadly-insinuated notion: when

PCI made the six itemized "transfers" to make good on preceding "overdrafts" on its account,

"payments" on debt from a "loan" were "made from funds derived from wholly fraudulent and

fabricated financial transactions conducted in connection with the Ponzi scheme." However, on its

face the pleading does not adequately outline the nature of the debts *to the Bank* that would have

been satisfied when overdrafts were rectified. The Trustee does not plead predecessor-

circumstances and -events for any of them to make out "the who, what, when, where, and how,"

"the first paragraph of any newspaper story,"--to lay out the specific backdrop of the transfers. *See*

---

[9]Since the issuance of *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999), local appellate authority has countenanced stretching the record on a motion under Rule 12(b)(6), beyond the four corners of a complaint. The stretch, however, is best-justified when limited to the content of extrinsic *documents* such as contracts, deeds, UCC filings, that are "necessarily embraced by the pleadings," i.e. that are material to the pleaded controversy but have objectively-manifested content.

[10]Facial *plausibility* being the standard under Rule 12(b)(6) for the fact-pleading of any claim to relief, since the Supreme Court's issuance of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Ritchie Capital Mgmt., L.L.C. v. Jeffries*, 653 F.3d 755, 764 (8th Cir. 2011) (citing *Summerhill v.*

*Terminix Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)).[11]

The question thus remains: has the Trustee plausibly pleaded the presence of

preexisting debts, as to which payment was made by transfers that the Trustee characterizes as

fraudulent? This issue is relevant to Associated Bank's motion in three ways. Associated Bank's

attorney argued one way that had no merit at all in the big picture of bankruptcy relief.[12] The

second did bear on the extent of avoidability under a constructive fraud theory, as to the amount

of the transfer. *See* treatment *infra*, pp. 21-25. The third came into the picture only after the

Minnesota Supreme Court issued *Finn v. Alliance Bank*. *See* treatment *infra*, pp. 16-19.

The law that specifically governs the relationships on bank accounts furnishes a

better frame of reference for analyzing the pleading on this point, than the Trustee's misleading

notion of "loans" on a "short-term open end credit transaction."[13]

> Funds deposited in a bank become the property of
> the bank, and a debtor/creditor relationship is
> established. . . . However, a general deposit of funds
> in a personal account is not equivalent to actual
> receipt of funds by the bank in payment of a debt.
> The Minnesota Supreme Court has recognized that
> bank deposits are not loans in the ordinary sense, but
> rather and only banking transactions peculiar in the
> banking business, which the courts recognize and
> deal with according to commercial usage and
> understanding. . . . Although the bank possesses
> funds deposited in checking accounts, . . . it remains

---

[11]These decisions applied the pleading standard of Fed. R. Civ. P. 9(b). However, as a capsule description of how to word a plausible narrative-basis for an element of a claim in suit, they are entirely appropriate.

[12]Counsel went out on a cracking limb on the notion that fraudulent transfer law *required* that a defendant have been a *creditor* of the referent debtor, before it may be sued for avoidance. This, of course, is utterly wrong. Unlike the law governing *preferential* transfers, 11 U.S.C. § 547(b)(1), no applicable fraudulent-transfer statute, state or federal, requires that the defendant-recipient have been a creditor.

[13]Eventually, the parties presented some analysis based on this authority--however incompletely and imprecisely.

> obligated to pay the money out on checks of
> depositors.

*Swift County Bank v. United Farmers Elevators*, 366 N.W.2d 606, 609 (Minn. Ct. App. 1985)

(citations and interior quotes omitted).

The debtor-creditor relationship described by that legal authority--the one that arises

on an account-holder's deposit of funds--obviously runs one way, from the bank to the account-

holder.  Where a checking account is involved, a debtor-creditor relationship running the other way

may arise--when the account-holder draws checks and the checks are presented for payment when

the account does not hold sufficient funds to honor them all.  This comes about under provisions

of Article 4 of the Uniform Commercial Code that govern such "NSF" activity, as well as the legal

governance imposed by the Federal Reserve Banks for the clearing of interbank transactions on

checks.  A legal analysis for these functions is set out for the context of trustees' avoidance

litigation in bankruptcy, in *In re AppOnline.com, Inc.,* 296 B.R. 602, 608-611 (Bankr. E.D.N.Y.

2003).[14]

Generally speaking, when a check is presented to a depository bank on an account,

a period starts during which the depository bank may take alternate actions as to payment on the

check--i.e. to honor (pay on) it or to dishonor (bounce) it.  *In re AppOnline.com, Inc.*, 296 B.R. at

---

[14]The detailed explanations in *In re AppOnline.com* were based on witnesses' testimony as to the operation of interbank functions in the state of New York.  Another court similarly relied on expert witness testimony and the text of a state's enactment of Article 4 of the Uniform Commerical Code, to set out similar development as findings of fact on standard industry practices and function.  *In re Agriprocessors, Inc.,* 490 B.R. 852, 859-861, 864-866 (Bankr. N.D. Ia. 2013).  Here, Associated Bank built out this part of its argument on the cheap--citing these decisions as if the whole thing were purely a matter of law, and certainly not acknowledging any factual dimension by retaining an expert or using fact witnesses. However, for both *AppOnline.com* and *Agriprocessors*, the described practices were structured under local adoptions of Article 4, and governance from local branches of the Federal Reserve Bank.  All of these legal authorities ensure rapid, predictable interstate transfers of funds through uniform, standardized rules and practices.  Neither side here suggested it should operate any other way for a bank serving a customer in Minnesota.  The analogs for all of the state statutes cited in *Agriprocessors* and *AppOnline.com* are found at Minn. Stat. §§ 336.4-301, 336.4-302, and 336.4-213.  In any event, both sides relied on the descriptions of structure and process in these decisions and both sides seemed to concur in the end-point of their analysis.  So for ease in placing the amended complaint's allegations into a factual and legal context, these decisions are cited--despite the fact that they do not speak expressly to how it would have operated for PCI and the Bank in Minnesota.

609.  That period expires at midnight of the banking day after the check is presented to the depository bank through the Federal Reserve Bank.  *Id.*  (Hence, the banking-industry term, "the midnight deadline.")[15]

Up to the midnight deadline, the presentment of the check gives rise to a "provisional NSF" status for the account, and for the depository bank's reserve account at the Federal Reserve Bank.  *In re AppOnline.com, Inc.*, 296 B.R. at 609-610.  As soon as the midnight deadline passes, the depository bank has the obligation to honor (pay on) the check.  *In re Agriprocessors, Inc.*, 490 B.R. at 865-866; *In re AppOnline.com, Inc.*, 296 B.R. at 610.  *See also Corsica Livestock Sales, Inc. v. Sumitomo Bank of Calif.*, 726 F.2d 374, 377 (8th Cir. 1983).  If at that point the balance in the drawer's account is less than the amount of the check, a "true overdraft" by the drawer-account holder occurs; and a debt from the account-holder to the depository bank arises--"amount[ing[ to an extension of credit to [the] customer [-account holder]," *In re AppOnline.com, Inc.*, 296 B.R. at 610 and 611.  This is what can give rise to a debtor-creditor relationship on a checking account, that runs from account-holder to bank.

The Trustee's summary assertion in legal terminology, that PCI "overdrew the PCI . . . Bank accounts," thus saves the Trustee's foundational point--the existence of a debt--as a point of pleading.  The creation of a debt from drawer-accountholder to a depository bank is inherent in the legal notion of an overdraft, when presentment is made for a draft in an amount exceeding the current balance and the draft is nonetheless honored or at least is subject to obligatory honoring after the midnight deadline.

In a connotative way, at least, this allegation of overdraft was sufficient to put Associated Bank on general notice that the Trustee was relying on the larger narrative-theory of his

---

[15]Minn. Stat. § 336.4-108 ("Time of Receipt of Items") makes the fixing of the midnight deadline more comprehensible, given the Federal Reserve Bank's practice of presenting checks cleared through it to depository banks in the evening.  This timing is noted in *In re AppOnline.com*, 296 B.R. at 608.

clawback effort, that avoidable fraudulent transfers had been made by the use of monies from later-defrauded investors to pay debts incurred in furtherance of the Petters Ponzi scheme--here, obligations to make the Bank whole on a half-dozen checks that had taken NSF status on presentment and that the Bank honored at some point, which debts were "paid" after the midnight deadline by deposits or other transfers into PCI's account..

### 2.  Effect of *Finn*: Trustee's Case for Actually-Fraudulent Transfers

The Trustee's main substantive theory for avoidance was the Ponzi scheme presumption--as set out in his pleading, particularly ¶ 43 of the amended complaint, and especially in oral argument.  A presumption that the "payments" had been made with actual fraudulent intent was the linchpin of the Trustee's suit against Associated Bank.

MUFTA's actual-fraud variant, Minn. Stat. § 513.44(a)(1), is sued out under Count II of the amended complaint.  Under the statute there is only one specific factual element, that the transfer in question was made "with actual intent to hinder, delay, or defraud any creditor of the debtor."

Like any element going to a past subjective state of mind, this one has its difficulties of proof.  Those difficulties were addressed in part in the statute, which permits actual fraudulent intent to be inferred on proof of surrounding circumstances consistent with the harboring of such intent--the so-called "badges of fraud."  Minn. Stat. § 513.44(b) (2014); *Citizens State Bank Norwood Young America v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014).  However, in the specialized context at bar, the judicially-recognized Ponzi scheme presumption made the question of subjective intent easy, with proof of the right platform.  As long as it was established that the transfer had been made "in furtherance" of a Ponzi scheme, the statutory intent was to be presumed.  *See* discussion in *In re Polaroid Corp.*, 472 B.R. 22, 35-36, 43 (Bankr. D. Minn. 2012), *aff'd on other grounds*, *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857 (8th Cir. 2015); *In re Petters Co., Inc.*, 495 B.R. at 907-908.  (*Ritchie Capital Mgmt, LLC v. Stoebner* enumerates the other circuit courts that

13

had adopted the presumption as of mid-2015.  779 F.3d at 862 n.6.)

        To make out a basis for this specialized presumption, the Trustee proposed that the Bank's accommodations to PCI to avoid bouncing checks and draws preserved the accounts as part of the necessary equipment for Tom Petters's scheme; also, that the avoidance of the normal consequences to a bank customer preserved Tom Petters's public image and that of "his Associates" as responsible and successful intermediaries in consumer goods inventory.  The subsequent central thrust of the argument was that keeping PCI's accounts operating without interruption from the overdrafts prolonged the scheme.[16]  As the Trustee would have it, the transfer of funds from PCI to rectify overdrafts "furthered" the scheme by avoiding the disruption of the Bank's services to PCI.  From that furtherance a fraudulent intent on the part of PCI as ostensible transferor, cognizable under MUFTA, was to be presumed as to any use of other monies passing through PCI that were transferred to (deposited with) the Bank for credit on PCI's account.  Were this string of adjudications to be made, the application of the presumption would have made out a prima facie case for the avoidance of the six account-events identified by the Trustee.

        But *Finn* took away the possibility of all that.  The receiver in *Finn* had made a very broad argument to extend the federally-developed presumption to the facts of his case:  the presumption deemed a pervasive intent to defraud creditors, to any and every payment of money made out of the general business structure through which a Ponzi scheme is perpetrated.  The *Finn* court not only rejected the all-encompassing scope that the receiver argued for the presumption's application; it categorically rejected any presumption of fraudulent intent.  860 N.W.2d at 647-648.  In the wake of *Finn*, no such mechanical attribution of fraudulent intent is permitted as to the

---

[16]The notion of prolongation through the core operation of the scheme--the rolling of funds from later investors to earlier ones--is set out at amended complaint, ¶ 22.  In briefing and oral argument, the Trustee's counsel argued that such a causality could be extended to the very different relationship and events that involved PCI and the Bank.

perpetrator of a Ponzi scheme, in any litigation founded on MUFTA.[17]

The result is inescapable: on the Trustee's pleading, his main articulated vehicle for an actual-fraud theory under MUFTA fails as a matter of law as to this avenue for avoidance. His trump card is not legally available to him.

He had another alternative, of course: pleading that PCI made the transfers with the statutory intent and setting out specific pleading of surrounding acts, events, and circumstances that logically went to the intent that accompanied those very transfers. This, of course, was the "badges of fraud" option under Minn. Stat. § 513.44(b).

The Trustee's pleading fails on this alternative. It identifies very specific acts as the subject transfers--those "payments" having apparently consisted of depositing funds or directing wire transfers into the account. But the Trustee does not lay out a single one of the statutory badges or any other surrounding circumstance on which it could be inferred that PCI did those things with a specific accompanying intent to hinder, delay, or defraud any of its creditors by doing them. There is much boilerplate pleading on the general operation of the Petters scheme, in the rote text common to virtually all of the Trustee's litigation docket. But there is no description of surrounding circumstances, that would go to an intent harbored by Tom Petters or any of his "Associates," directed toward any third-party creditors of PCI, at the half-dozen times when a rectifying transfer would have been made to deal with an actual overdraft on PCI's account at the Bank.

---

[17]In *Finn*, the Minnesota Supreme Court took particular exception to the receiver's argument that the presumption not only applied to all transfers by a perpetrator; it was "conclusive" as well. 860 N.W.2d at 645-646. Previously, irrebuttability had not been articulated as a characteristic of the presumption of intent, by any of the federal courts that originally framed the device or by the federal trial courts in this district that had adopted it. Locally, in fact, entirely to the contrary; *see In re Polaroid Corp.*, 472 B.R. at 42 (intent inferred via presumption "can always be rebutted by hard proof of contrary intent, i.e. a credible motivation to make the transfer that is grounded in good economic reason, *as to the transferor-entity*") (emphasis in original).

This is crucial.  Originally, the Trustee portrayed PCI as running its account at the Bank on the razor's edge of a zero-balance for four and a half years--routinely going into NSF status and, allegedly at the Bank's sufferance, avoiding overdrafts and their consequences only by making "payments."[18]  But in the amended complaint he did not plead any surrounding facts that suggested PCI intended to directly defraud its third-party creditors, by catching and rectifying a half-dozen true overdrafts after the fact.

*Finn* dictates that avoidability under MUFTA be determined on a transfer-by-transfer basis.  860 N.W.2d at 647.  It is not to turn on the "form or structure" of the transferor, even if the transferor is engaged in a broader fraudulent scheme that is effected through other transactions and transfers.  *Id.*  For want of badge-specific fact pleading, the amended complaint fails plausibility through the badges-based alternative on actual fraud, for the specific transfers on which it is based.

In a fillip toward its end, *Finn* acknowledges another haven for an actual-fraud theory in a Ponzi scheme clawback lawsuit, at least at the pleading stage.  The bulk of *Finn* is devoted to substantive rulings on a claim against a single bank, one of multiple defendants in the receiver's litigation, that the trial court had disposed of on summary judgment.  But after that *Finn* addresses the pleading as to a group of other defendant-banks that had aggressively acted to defend earlier in the litigation against them, by moving to dismiss the receiver's complaint in lieu of answering. For those defendants, it was held that "the Receiver's complaint sufficiently alleged fraudulent intent," and "stated a claim for actual fraud against [sic] [those] Banks," so as to meet muster under the Minnesota state analog to Rule 12.  860 N.W.2d at 654.  This conclusion was justified on only

---

[18]In the Exhibit A to his original complaint [Dkt. No. 1], the Trustee itemized several hundred such account-events, dating from the beginning of 2000 to mid-2004, that he sought to avoid as fraudulent transfers.  After Associated Bank was served with the complaint, its counsel pointed out the leeway given to PCI and the Bank under banking laws--by the law discussed *supra* at pp. 10-12--and the Trustee amended his complaint after analysis on that new thought.  He forsook all claim to avoid the account-events that had resulted in provisional NSF status but not true overdrafts occurring after the midnight deadline.  (This process is admitted in the Trustee's second supplemental memorandum [Dkt. No. 26], 4-5.)  This reduced to six the number of transfers sought to be avoided.  The amount of judgment sought went far down, from nearly $182,000,000.00 to around $2,500,000.00.

three features of the complaint's content, summarized by the *Finn* court as follows:

1.  The complaint "documented a number of fictitious and oversold participation interests" in real estate financing transactions (the vehicle of the Ponzi scheme there) "sold by" the corporate vehicle of the scheme.

2.  The corporate vehicle "made the payments to the [specific] Banks with actual intent to hinder, delay, or defraud creditors of" the corporate vehicle or the individual perpetrator of the scheme.

3.  The individual perpetrator had "admitted . . . that he operated a Ponzi scheme *to defraud banks* in connection with commercial loans that [he] had arranged."

*Id.* (emphasis in original).

At first, this holding seems incongruous. Much of the substantive treatment in *Finn* seems to evidence skepticism, over the basic applicability of MUFTA's remedies to redress a failed Ponzi scheme for the benefit of defrauded investors left unsatisfied at the failure. Yet, there the ruling is, 860 N.W.2d at 654: a complaint adequately states a claim under MUFTA for avoidance of an actually-fraudulent transfer where a plaintiff alleges in detail a pattern of fraudulent investment-related conduct by a party that has been operating a Ponzi scheme; alleges that the subject transfers had been made with actual intent to hinder, delay, or defraud creditors of the perpetrator; and alleges that the Ponzi scheme had been conducted generally to defraud investors like the defendant-recipient(s) of the subject transfers. Under this component-ruling of *Finn*, suit under MUFTA may be initiated under an actual-fraud theory on the right facts featuring a Ponzi scheme, and maintained beyond the pleading stage. The scope or impact of *Finn*'s rulings on the substantive merits of claims for avoidance and affirmative defenses can be debated. But on the

sufficiency of pleading, that much is clear from this terse sequence in the opinion.[19]

However, in endorsing the sufficiency of this pleading on actual fraudulent intent the *Finn* court focused on the commonality between the defendant-movants and the class of victims of the scheme. That was not an accident. *Finn* rejects the *presumption-based* treatment of actual intent in Ponzi scheme cases developed by the federal courts; but nonetheless *Finn* countenances a theory of avoidance for Ponzi scheme cases on a theory of actual fraud, as an abstract matter of law. This is harmonized by one specific point: the remedy could lie, in theory, where past victims and the defendant-in-avoidance were of the same class and position in their past relationships with the purveyor of the scheme.

This is a break in the fog of doubt that *Finn* spewed up earlier, 860 N.W.2d at 652-653, as to whether MUFTA's remedies apply to Ponzi-clawback litigation at all. The reach of this pleading-oriented holding is open to debate. However, it can fairly be read for the proposition, that a plaintiff may sue on an allegation that a defendant received an actually-fraudulent transfer from the perpetrator of a Ponzi scheme, where the circumstances indicate that the defendant-recipient had been situated in a transactional relationship with the debtor similarly to the class of intended victims of the scheme, and thus the transfer may have been made within the central structure and operation of the scheme.[20]

The question then is whether that option saves the Trustee's pleading here. The analysis goes back to the matter of plausibility--a requirement of the pleaded factual theory for any claim sued out in the wake of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v.*

[19]*See also* 860 N.W.2d at 647 (acknowledging that "a court could make a rational inference from the existence of a Ponzi scheme that a particular transfer was made with fraudulent intent" (interior quotes omitted)).

[20]Where the claim of actual fraud goes after pleading is another matter. The *Finn* court made a number of pronouncements on the issue of reasonably equivalent value in this context, as an essential element of a constructively-fraudulent transfer, Minn. Stat. § 513.44(a)(2), and of an affirmative defense to a claim of actually-fraudulent transfer, Minn. Stat. § 513.48(a). That complex of issues is not implicated by the motion at bar.

*Iqbal*, 556 U.S. 662 (2009).   Under this alternate *Finn*-based theory, any sense of plausibility

vanishes, as to the Trustee's pleaded facts.

       The Trustee has pled the nature and operation of Tom Petters's scheme in a

consistent fashion in nearly two hundred complaints.   He has never alleged that the scheme was

perpetrated over its term of years to defraud and victimize the depository banks through which he

funneled all the money.   He does not do so in his case against Associated Bank.[21]   The victims

identified as a class in the amended complaint are different; had the transfers not been made, the

Bank (or its successor Associated Bank) did not stand to lose in the same way or by the same

direct causality as PCI's current and future investor-creditors.   The fact-pleading of these transfers'

position in the operation of the Petters scheme does not fit into the pleading-content protected from

dismissal by that late ruling in *Finn*.

       In summary: the Trustee does not plead any facts that go to specific intent, directly

or by badge-based inference.   Bounded as the Trustee's suit is by the legal and commercial

relationship between PCI and the Bank, there is no fact-pleading of an intent to defraud other

depository banks through a comprehensive scheme involving transfers of the sort pleaded.   Nor

does the Trustee plead other facts from which to infer an intent to hinder, delay, or defraud PCI's

general creditors, motivating the six subject acts of transfer.   The Trustee has not pled a

sustainable case for an actually-fraudulent transfer.

       As a result, Count II of the amended complaint is to be dismissed.   There is no way

to contort a plausible theory for an actual, directed fraudulent intent in connection with the pleaded

---

[21]The notion of an actionable fraudulent transfer on such facts makes no sense.   The idea would
have to be: pumping money into the PCI account at the Bank just a little late under banking law, and
dodging the consequence of an actual dishonor of outstanding checks, was a means of *directly* hindering,
delaying, or defrauding PCI's *other* bankers.   *Finn*'s transfer-specific directive, however, puts the focus on
the very transfer in question, as it relates to the interests of potentially-defrauded current or future
creditors.   On that pin-point, there would be no plausibility to the notion of making large, slightly-late bank
deposits with one bank with a targeted intent to deprive other banks doing business with the debtor,
current and future, *of the corresponding value.*   Even if the target class of creditors were considered to be
PCI's general creditors, any notion of fraudulent intent is equally nonsensical.

transfers, out of the basic posture of PCI and the Bank at the times of the transfers.  As a result,

a grant of leave to amend would be futile.  Count II must be dismissed with prejudice.

### 3.  Effect of *Finn* and Common-Issues Rulings:
### Trustee's Case for Constructively-Fraudulent Transfers

The Trustee's alternate theory under MUFTA, pled under Counts III - V of the

amended complaint, was that the "payments" had been a constructively-fraudulent transfer.  Minn.

Stat. §§ 513.44(a)(2) and 513.45(a) - (b) (2014) permit avoidance on more "objective" facts

surrounding a transfer by a debtor:

> [A] claim for constructive fraud turns on a creditor's
> ability to show that the debtor made the transfer
> 'without receiving reasonably equivalent value,' and
> that the debtor was insolvent, or the transfer made
> the debtor insolvent or unable to pay its debts.

*Finn v. Alliance Bank*, 860 N.W.2d at 645.[22]

---

[22]In pertinent part, the statutory text is:

> (a) A transfer made . . . is fraudulent as to a creditor, whether the
> creditor's claim arose before or after the transfer was made . . . , if the
> debtor made the transfer . . . :
>
> . . . .
>
> (2) without receiving a reasonably equivalent value in
> exchange for the transfer . . . , and the debtor:
>
> > (i) was engaged or was about to engage
> > in a business or a transaction for which
> > the remaining assets of the debtor were
> > unreasonably small in relation to the
> > business or transaction; or
> >
> > (ii) intended to incur, or believed or
> > reasonably should have believed that
> > the debtor would incur, debts beyond the
> > debtor's ability to pay as they became
> > due.

Minn. Stat. § 513.44(a); and

> (a) A transfer made . . . by a debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made . . . if the debtor made the
> transfer . . . without receiving a reasonably equivalent value in exchange

On the issue of reasonably equivalent value for this theory, the Trustee's pleading is cryptic.  There is no detail as to how the rectification of overdrafts gave PCI less than reasonably equivalent value for monies transferred to the Bank that would have been applied to the amount of the overdrafts to raise the account balance above zero.  The fact-pleading on the account events was very sparse.  Nothing specific was said, to whether interest or bank charges stacked onto the amount of the negative balance then-rectified:

> 39.     Shortly thereafter following each of the Credit Transactions, PCI would make a payment to Associated Bank that would serve to repay the loan of the overdraft amount lent to PCI by Associated Bank.

Amended Complaint, ¶ 39.[23]  To equal ineffect, the recitations in the counts under a constructive-fraud theory, III - V, merely parroted a part of the bare text from the statute:

> 64.     The Debtor received less than a reasonably equivalent value in exchange for the Negative Balance Transfers.

Amended Complaint, ¶¶ 64 and 70.

Even before *Finn*, this imprecision posed a real problem for the Trustee on this theory of recovery.[24]   The Third Memorandum on common issues in the Trustee's litigation

---

for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . .

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Minn. Stat. § 513.45.

[23]The doubled instance of repetitious forms of verb-and-noun in a single sentence is clumsy. Apparently a point was being reinforced; but once would have been enough.

[24]The lack of breakdown for the "payments" markedly contrasts with the pleading in the bulk of the Trustee's avoidance litigation.  Where the Trustee is suing individual or corporate lenders and investors on specific transactions, his pleading blazons a split between repayment of principal originally advanced, and the interest or return-on-investment paid pursuant to PCI's promissory notes.  The latter is always pointedly characterized as "false profits" recoverable in a clawback effort under MUFTA.

recognized that value, for the purposes of a constructive-fraud theory, was received "if, in exchange for the transfer . . . an antecedent debt [of the debtor] is secured or satisfied . . . ." *In re Petters Co., Inc.*, 499 B.R. at 354 (quoting Minn. Stat. § 513.43(a) (2012)).

For the ruling on the issue presented there, the policy- and equity-based analysis of *Scholes v. Lehmann*, 56 F.3d 750, 756-758 (7th Cir. 1995) was adopted: when the remedy for a constructively-fraudulent transfer is brought to bear on payments made by the purveyor of a Ponzi scheme to a past investor, using monies infused by a current defrauded investor, receipt of value is deemed to the debtor-transferor to the extent of principal repaid to the earlier investor, in satisfaction of a debt for restitution. 499 B.R. at 356. The interest component of any such payment, however, is not cognate to the debt service (interest) paid by a company that has applied the proceeds of legitimate borrowing honestly taken from the later investor to make capital expenditure, to finance operations, or to meet the other costs of a real operating business. By fostering the scheme's pretense at a time when the purveying entity is insolvent, and by increasing that insolvency, the payment of ostensible interest only prolongs the scheme. 499 B.R. at 356-357.

Where this is done as part of a pervasive, multi-victim scheme that later fails, and a receivership or bankruptcy case is commenced to give a global remedy for unsatisfied end-victims, all participants may be subject to a judicial recasting of their relationships with the purveyor. The theory of restitution in equity would furnish the guidance for structuring remedies. 499 B.R. at 356. In equity and under statute, all investors are deemed to have been entitled to the recovery of their principal, as value they originally parted with and value they are entitled to have received in return. When that matched dollar-for-dollar in a purveyor's payment to a fraudulent-transfer defendant, there was reasonable equivalence. 499 B.R. at 356. But true value on the retirement of a bona fide, honest debt cannot be attributed to a past receipt of interest paid by the purveyor of a Ponzi scheme, from funds received from new victims that provide lending or investment to the purveyor. Hence, the interest component of past payments is recoverable in avoidance, when a

defendant-transferor's insolvency or other financial insufficiency is established.  499 B.R. at 356-357.

Associated Bank seized on this analysis for the motion at bar, and skewered the amended complaint for its lack of any allegation that anything had been "paid" to the Bank, above an ostensible "principal" debt owing on the "short-term open credit transaction" the Trustee described.  At oral argument, the Trustee's counsel came close to conceding that.  But, he never forsook his constructive-fraud theory.

*Finn v. Alliance Bank* speaks to the issue of reasonably equivalent value in the application of MUFTA to the remediation of a failed Ponzi scheme.  When the Minnesota Court of Appeals issued its opinion in *Finn v. Alliance Bank*, it characterized the prior federal case law's denial of reasonably-equivalent value to the payment of interest as another component of a more comprehensive Ponzi scheme presumption.  838 N.W.2d 585, 598 (Minn. Ct. App. 2013).  The Minnesota Supreme Court endorsed that categorization. 860 N.W.2d at 645-646.  But then it rejected this component presumption as well, as an adjudicative shortcut for fact-finding under MUFTA.  860 N.W.2d at 645-646, 649-653.  This ruling dovetailed with the *Finn* court's broader observation, that "the focus of [MUFTA] is on individual transfers," requiring a plaintiff initiating the "asset-by-asset and transfer-by-transfer . . . inquiry under MUFTA . . . to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption . . . ."  860 N.W.2d at 647.

After that, *Finn* addressed the broader issue on its substance, of whether reasonable equivalence of value lay in a debtor's repayment of debt owing to a defendant.  The *Finn* court concluded that "any legally enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA" for the purposes of the definition of "value" under Minn. Stat. § 513.43(a).  860 N.W.2d at 651.  In the context of repayment of debt, "a transfer qualifies as constructively fraudulent only if it depletes the assets of the debtor without a reasonably equivalent

reduction in the debtor's liabilities." 860 N.W.2d at 652-653.[25]

The defendant-transferees in *Finn* had all been lenders on debt incurred by the debtor-transferor to facilitate and finance genuine, existing transactions involving real estate. Separately from those bona fide transactions, the debtor-transferor had induced other lenders to advance money under the pretensed auspices of the same sort of transaction, which did not exist in reality--that having occurred within the operation of a true Ponzi scheme. 860 N.W.2d at 642. Emphasizing the genuineness of the underlying transactions in suit before it, the *Finn* court rejected out of hand the notion that repayment of any part of the debt in question had lacked reasonably equivalent value to the debtor. 860 N.W.2d at 655. It also pointed to the lack of any evidence of irregularity or commercial unreasonableness in the terms of the loans the debtor repaid via the transfers the receiver sought to avoid. 860 N.W.2d at 656. Thus, there was no basis for avoidance under MUFTA.

The *Finn* court made its pronouncements on reasonably equivalent value on a distinctive set of facts. The pronouncements are cast in several different directions--observations on the policy underlying MUFTA; the propriety of judicially construing presumptions of broad application from statutory text; the soundness of the specific presumptions argued before it; and the evaluation of the content of the record before it as a basis for fact-finding on a direct application of its interpretation of the substantive law, without the interference of a presumption's operation. The applicability of *Finn*'s substantive rulings beyond the facts presented there is open to debate. Yes, in the wake of *Finn*, the viability of the analysis adopted for the Trustee's avoidance litigation docket is unsettled. It is still an open question as to which rule of decision should apply for the application of MUFTA's constructive-fraud provisions to transfers in repayment of a debt incurred

---

[25]Playing back to its earlier reference to "any *legally enforceable* right to payment," 860 N.W.2d at 651 (emphasis added), *Finn* cites to old decisions to support the latter proposition: *Thompson v. Schiek*, 213 N.W.2d 911 (Minn. 1927) (which refers to "[p]ayment of an *honest debt* [being] not fraudulent," 213 N.W.2d at 912 (emphasis added)); and *Nat'l Sur. Co. v. Wittich*, 237 N.W. 585 (Minn. 1931) (which refers to an "antecedent debt [being] '*good* consideration,'" 237 N.W. at 586 (emphasis added)).

for a business transaction that was not genuine and existing, and that fell within the rolling churn of a Ponzi scheme as generally understood.[26]

But regardless of which rule and application harmonize with *Finn*, the pleading here fails on the element concerning reasonably equivalent value. The amended complaint has none of the elaborate text about "false profits" that features prominently in the Trustee's complaints against defendant-recipients that lent to PCI to finance transactions that were falsely-pretensed--the allegations of contractual interest actually paid at anomalously-high rates, with the proceeds of borrowing from later-duped lenders. If indeed the transfers here only brought a checking account balance above a negative level, nothing more happened than the repayment of an analog to principal indebtedness.[27] The Trustee never pleads that the Bank received interest or any sort of imposed fee or penalty on account of the overdrafts that he identifies.[28] The repayment of indebtedness pled in the bare bones of the amended complaint--created as a matter of law by operation of Article 4, and perforce to be treated as an obligation for principal alone--did not lack reasonably equivalent value to PCI as account-holder and transferor. This is the outcome whether this lawsuit is governed by MUFTA under the pre-*Finn* federal analysis, or whether *Finn* is given broader application beyond its specific facts on the matter of reasonably equivalent value.

The Trustee's counsel came very close to conceding this during oral argument. He did not offer to withdraw Counts III - V, however. Thus a ruling is necessary. It is the only one possible on the facts as pled: the Trustee has no claim against Associated Bank for avoidance of

---

[26]This issue has been submitted for decision under a motion for dismissal in another adversary proceeding in this docket.

[27]And the repayment of principal alone would have happened whether the overdrafts were rectified by subsequent "routine" deposits, no matter how large, or by specially-directed wire transfers from PCI's general funds. The Trustee's elusive terminology ill-serves the requirements of notice and precise judicial analysis alike; but here, at least, the coyness does not impair anything.

[28]One could see such things being charged under an overdraft-protection plan given to customers of the Bank. But nothing is pled about PCI having such protection in the first place, let alone its activation upon the incurring of the overdrafts.

the six identified transfers, under MUFTA's constructive-fraud provisions.  As a possessor of the account records, the Trustee had access to the proof for a broader claim, for the avoidance of payment above a principal component, and thereby could have preserved a right to argue for a viable constructive-fraud theory under a narrow reading of *Finn*.  He did not do so.  Thus it must be assumed that he did not have the wherewithal in evidence to advance that.  Counts III - V are to be dismissed with prejudice.

### 4.  Remaining Requests for Relief Originally Pleaded by the Trustee

These rulings address all but three counts of the Trustee's amended complaint.  To enable a final disposition, the others should be treated.

Through Count VI, the Trustee sought to compel Associated Bank to "disgorge" "all funds received" through the six transfers in question.  The theory here is purely one of equity, on the thought that the Bank "knowingly received monies from the Ponzi scheme, [and] was unjustly enriched through its receipt of the fraudulently obtained monies to the detriment of other investors in PCI . . . ."  Amended Complaint, ¶ 76.

The reference to "other investors" makes it pretty clear that this whole count was swept into the amended complaint as part of the Trustee's rote, boilerplate pleading.  The Bank is not characterized as an "investor" in PCI anywhere else.  There is no separate, specific fact-pleading for the Trustee's insinuation, of an inequitable and iniquitous "knowing" receipt by the Bank.  There is only the perfunctory, shallow, and lonely throw-off, that the

> . . . Bank knew or should have known that it was benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to [Tom] Petters and PCI in connection with the Ponzi scheme.

Amended Complaint, ¶ 42.  With that little, it is impossible to see anything concrete and plausible enough to trigger an equitable remedy.

In any event, this count is barred by the Trustee's simultaneous assertion of multiple theories for recovery under law, i.e. MUFTA. *In re Petters Co., Inc.*, 499 B.R.  at 370-375 (relying on analysis in *United States v. Bame*, 721 F.3d 1025, 1029-1031 (8th Cir. 2013)).  Count VI is thus to be dismissed.

In his original and amended complaints, the Trustee pleaded requests for relief in two other forms.  He framed Count I under 11 U.S.C. § 542, seeking a recovery of funds equating to the "Negative Balance Transfers" under the notion that somewhere at that time there was associated "property of the estate" that must be turned over to him, or accounted for.[29]  Under Count VII he sought disallowance pursuant to 11 U.S.C. §§ 502(b) and 502(d), "to the extent that Associated Bank asserts it is entitled to any claim in this bankruptcy case [sic], directly on its own account or indirectly by virtue of any other agreement with . . . PCI . . . ."  After the three sets of memorandum rulings were issued, the Trustee relinquished these claims for relief across almost all of his litigation, albeit without prejudice.  In this adversary proceeding they were dismissed by an order issued on stipulation [Dkt. No. 20].

Thus all pleaded claims in suit have been addressed and disposed of.[30]

---

[29]This count was common to the Trustee's pleading across his avoidance litigation.  The underlying thought is vague.  The analysis in *In re Redding*, 247 B.R. 474, 477 (B.A.P. 8th Cir. 2000) shows the error inherent in the vagueness.

[30]For this motion, Associated Bank tried to advance various affirmative defenses in preemptive fashion.  This was all done on the pretext that the face of the Trustee's pleading itself somehow made out the factual prerequisites for the defenses.  This was another instance of Associated Bank defending on the cheap, trying to stretch Rule 12(b)(6) to throw up every conceivable defense in kitchen-sink numbers.  The failure of the Trustee's pleaded claims makes it unnecessary to address these issues--the "mere conduit" defense under 11 U.S.C. § 550, etc.

**ORDER**

On the rulings in this memorandum, IT IS HEREBY ORDERED that Counts II - VI of the Plaintiff's amended complaint are dismissed with prejudice, for failure to plausibly plead a claim on which relief may be granted.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE